IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2009

## GREGORY L. SMITH v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C08-200     Roy Morgan, Jr., Judge**

_____

**No. W2008-02071-CCA-R3-PC  - Filed September 23, 2009**
_____

The petitioner, Gregory L. Smith, appeals the Madison County Circuit Court's denial of his petition for post-conviction relief.  The petitioner is currently serving a twelve-year sentence following his conviction for aggravated sexual battery, a Class B felony.  On appeal, he contends that the post-conviction court erred in determining that he received the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective by failing to: (1) adequately investigate; (2) adequately communicate with the petitioner, provide and discuss discovery, prepare the petitioner to testify, and convey plea offers; (3) elicit facts helpful to the defense at trial; and (4) interview and call witnesses for the defense.  Following review of the record, we find no error and affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ. , joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Gregory L. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James. G. (Jerry) Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The relevant underlying facts of the petitioner's conviction, as established on direct appeal, are as follows:

> The minor victim, L.C., . . . testified that she was fourteen years old at the time of the incident and lived with her mother, Emma Smith; her stepfather, [the petitioner]; and her uncle, Willie Clark.  On July 2, 2005, L.C. was alone in the house

with [the petitioner] while Ms. Smith was at work, and Mr. Clark had gone to the store. [The petitioner] came into the room where L.C. was lying on the couch and asked for the telephone. [The petitioner] walked over to the couch when L.C. did not answer. L.C. said [the petitioner] touched her in the vaginal area. L.C. asked [the petitioner] what he was doing. [The petitioner] did not respond and tried to unbutton L.C.'s blue jean shorts. L.C. said that she started kicked at [the petitioner] and struck him in the face with her foot. [The petitioner] removed L.C.'s clothes and threw her on the floor.

L.C. stated that [the petitioner] "started shoving his penis" in her as she continued to fight. L.C. said [the petitioner]'s penis was not inside her vagina for a long time. [The petitioner] told L.C. that he was not going to do anything to make L.C. pregnant. [The petitioner] then removed his penis and began biting L.C. in the vaginal area which L.C. said was painful. L.C. said she tried to get away from [the petitioner], but every time she moved, [the petitioner] moved with her, and then [the petitioner] "just stopped." L.C. said that [the petitioner] did not ejaculate during the incident.

L.C. went in the bathroom, removed her clothes, and took a bath. [The petitioner] stood outside the bathroom door and told L.C. not to tell anyone. Before the incident, L.C. had arranged to go shopping with her cousin, Blondale DeMoss. L.C. heard Ms. DeMoss honk her car horn and went outside. L.C. was crying and told Ms. DeMoss that "it hurt," Ms. DeMoss led L.C. back into the house and examined L.C.'s vaginal area in L.C.'s bedroom. L.C. left with Ms. DeMoss, and the two women tried to find L.C.'s mother. When they could not locate Ms. Smith, Ms. DeMoss drove L.C. to the emergency room.

. . . .

Dr. Mike [Revelle] was the attending physician at the Jackson-Madison County General Hospital's emergency room when L.C. arrived. Dr. Revelle testified that L.C. was very upset, and she did not want to be examined or questioned about the incident. Dr. [Revelle] told L.C. that he needed to know what had happened in order to treat her properly. L.C. reported that [the petitioner] began touching her inappropriately while she was sleeping on the couch, and then attempted to penetrate her vaginally with his penis. Dr. [Revelle] said that L.C. told him that she tried to fight off [the petitioner], but that [the petitioner] bit her in the vaginal area. L.C. said that she had taken a bath and changed cloth before coming to the emergency room.

Dr. [Revelle] said that it was necessary to sedate L.C. in order to perform a rape kit. A blood sample and vaginal swab were taken. Dr. [Revelle] said that there was almost no chance of finding any evidence because L.C. had bathed immediately after the incident, and [the petitioner] had not ejaculated. Dr. [Revelle] said that

L.C.'s physical examination revealed a great deal of swelling in the vaginal area. Dr. [Revelle] did not notice any teeth marks but stated that the redness and swelling were consistent with some type of pinching or biting.

Phyllis Taylor, a nurse with the hospital, testified that L.C. was very tearful and anxious when she arrived at the emergency room, and a sedative was administered in order for the doctor to perform an examination. Ms. Taylor examined L.C.'s external vaginal area. She described the area as very swollen and red, and she noted an abrasion. Ms. Taylor said the physical examination was consistent with L.C.'s description of the sexual assault.

Larry Brown testified that he was a sergeant with the Madison County Sheriff's Department at the time of the incident. . . .

. . . .

Sergeant Brown said that he could not locate [the petitioner] that weekend. On Monday morning, July 5, 2005, Sergeant Brown received a telephone call from [the petitioner's] sister informing him that she would be bringing [the petitioner] to the sheriff's department. When he arrived, Sergeant Brown read [the petitioner] his *Miranda* rights, and [the petitioner] signed a waiver of those rights. The department's nurse took a sample of [the petitioner's] blood. Sergeant Brown stated that [the petitioner] had a laceration on the inside of his right upper lip, a scratch on his left check, and some ointment on a scratch on his right shoulder.

On cross-examination, Sergeant Brown acknowledged that [the petitioner] was cooperative during the interview and offered no resistance to being examined or offering a blood sample. [The petitioner] gave a statement denying that he had committed the offense.

Agent Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation, performed a DNA analysis on the clothing samples provided by the sheriff's department. Agent Nelson said that no trace of semen was found on the victim's clothing. Agent Nelson detected blood on [the petitioner]'s blue jeans, but the sample was too small or too degraded for DNA testing. On cross-examination, Agent Nelson acknowledged that she did not test for the presence of saliva because the victim had bathed immediately after the offense.

Blondale DeMoss testified that she spoke with L.C. by telephone on July 2, 2005, and arranged to pick L.C. up for a shopping trip. . . .

When Ms. DeMoss arrived at L.C.'s house, L.C. was crying and upset. Ms. DeMoss repeatedly asked L.C. what was wrong. L.C. finally told Ms. DeMoss that

"it hurt" and pointed to her vaginal area. Ms. DeMoss accompanied L.C. to her bedroom. [The petitioner] was sitting at the kitchen table. L.C. laid down on her bed and removed her shorts and underwear. Ms. DeMoss said that L.C.'s vaginal area was swollen and she was bleeding. Ms. DeMoss and L.C. left the residence and tried unsuccessfully to find Ms. Smith. Ms. DeMoss then drove L.C. to the emergency room. Ms. DeMoss said that L.C. was very upset and had to be held down during the examination.

. . . .

[The petitioner] testified on his own behalf and denied committing the offense. [The petitioner] stated that Roderic Diggins dropped him off at the residence at approximately 1:00 p.m. when his shift was over. [The petitioner] said that he did not know L.C. was in the house. Mr. Clark left with Mr. Diggins to purchase some beer. [The petitioner] said that he did not see L.C. until after he had taken a bath. [The petitioner] denied that he spoke with L.C. that afternoon.

[The petitioner] said that L.C.'s brother arrived at the residence about five minutes after Ms. DeMoss and L.C. had left. Mr. Clark told [the petitioner] that Mr. Cook was armed. [The petitioner] went into the bedroom and locked the door. [The petitioner] said that Mr. Cook started beating on the bedroom door, and [the petitioner] ran into the bathroom and climbed out the window. [The petitioner] tried to run away but became winded. Mr. Cook caught up with him and kicked [the petitioner] in the mouth with his shoe. [The petitioner] said that he told Sergeant Brown about his encounter with Mr. Cook, and Sergeant Brown took notes about the incident.

[The petitioner] said that he agreed to submit to any type of testing because he did not have anything to hide. Although not entirely clear from the transcript, [the petitioner] said that he waited until Monday to turn himself in because he was waiting on his paycheck.

On cross-examination, [the petitioner] said that he noticed L.C. on the couch when he opened the front door. [The petitioner] said he sat at the kitchen table. [The petitioner] did not notice if L.C. was crying, and he did not see Ms. DeMoss go with L.C. into L.C.'s bedroom. [The petitioner] said that Ms. DeMoss pointed a knife at him as she was leaving with L.C. and asked him what he had done to L.C. [The petitioner] told Ms. DeMoss that he had not done anything. [The petitioner] agreed that he had no reason to doubt Dr. Revelle's and Ms. Taylor's testimony about the results of L.C.'s physical examination.

-4-

[The petitioner] insisted that the injuries on his face were inflicted by Mr. Cook. [The petitioner] said when Mr. Cook stopped hitting him, he said, "I told her I was gonna kill you." [The petitioner] said that Mr. Cook shot at the bedroom door, and [the petitioner] saw the bullets pierce the wood.

Sergeant Brown testified that he followed up on [the petitioner]'s report of Mr. Cook's assault. Sergeant Brown said that there were no bullet holes in the bedroom door. Sergeant Brown stated that he observed an open bedroom window on his first trip to L.C.'s residence. On cross-examination, Sergeant Brown agreed that his was the first time that he heard about Ms. DeMoss pointing a knife at [the petitioner]. [The petitioner]'s statement did not mention this fact. Sergeant Brown said he went over the statement with [the petitioner] three times to make sure it was correct.

*State v. Gregory Lee Smith*, No. W2006-01962-CCA-R3-CD (Tenn. Crim. App., at Jackson, Oct. 26, 2007). Based upon the foregoing, a Madison County grand jury indicted the petitioner for aggravated rape. Following a jury trial, he was convicted of the lesser included offense of aggravated sexual battery and sentenced to a twelve-year sentence to be served in the Department of Correction. A panel of this court affirmed the conviction and sentence on direct appeal. *Id*.

The petitioner subsequently filed a timely *pro se* petition for post-conviction relief alleging, among other grounds, that he was denied his right to the effective assistance of counsel. Following the appointment of counsel, an amended petition was filed, and a hearing was held, at which the petitioner, trial counsel, and Roderick Diggins testified.

**Post-Conviction Hearing**

The petitioner testified that his children retained trial counsel to represent him during the case. According to the petitioner, trial counsel never visited him in the jail, never provided him with copies of discovery or discussed the State's evidence against him, never discussed the facts of the case with him, and failed to prepare the petitioner to testify at trial. He also stated that he was not informed of any plea offers made by the State. The petitioner further asserted that, although he gave trial counsel a list of potential witnesses, trial counsel did not interview them or call them to testify at trial. According to the petitioner, trial counsel should have called the petitioner's children and his sister as witnesses, along with two friends who were present around the time of the incident. The petitioner acknowledged that the two friends he wished to have called as witnesses were not present at the time of the actual incident. Finally, the petitioner testified that trial counsel should have introduced into evidence the fact that he had no teeth at the time of the incident, in order to rebut the victim's testimony that he bit her.

Next to testify was Roderick Diggins, who stated that he had known the petitioner for several years. He stated that he had given the petitioner a ride home on the day of the incident and had gone inside the home when they arrived. Willie Clark was also present at the time, and the three men

-5-

remained in the petitioner's home for approximately fifteen minutes. Mr. Clark then asked Mr. Diggins to take him to the store, and the two men left. Mr. Diggins stated that they were gone no more than ten minutes and, upon their return, he observed the victim speaking with another young lady outside the house. According to Mr. Diggins, the victim was dressed in "nice clothes," and he got the impression that she was going somewhere. He also testified that the victim appeared calm and was not crying or screaming. Mr. Diggins stated that trial counsel spoke with him for the first time on the day of trial and that trial counsel did not call him as a witness, although he was available to testify. Mr. Diggins also testified that Mr. Clark has passed away after the trial but prior to the post-conviction hearing. On cross-examination, Mr. Diggins acknowledged that he had no way of knowing where the victim intended to go when he saw her on the day of the incident and that he could not contradict the testimony of the emergency room physician or nurse who stated that the victim was so distraught at the hospital that she had to be sedated.

Trial counsel testified that he was retained by the petitioner's family to represent him and that he had previously represented the petitioner in a simple assault case. In contradiction to the petitioners testimony, trial counsel stated that he met with the petitioner at the jail between two and four times and had reviewed the discovery materials with the petitioner. Trial counsel testified that he tried to negotiate a plea agreement with the State, but the petitioner refused any negotiations as he insisted he was innocent. Trial counsel testified that there was an informal offer of twenty years, but the petitioner refused the agreement.

Trial counsel acknowledged that the petitioner had given him a list of possible witnesses that included Mr. Diggins, Ms. DeMoss, and Lavonta Cook. However, based upon information discovered during his investigation, trial counsel did not interview the potential witnesses. He did speak with Mr. Diggins immediately prior to the trial but decided against calling him as a witness because he was not present during the actual time period the crime was alleged to have occurred. Mr. Diggins was not a fact witness, and the substance of his testimony, that the victim appeared calm, was contradicted by both the emergency room doctor and the nurse. Moreover, Mr. Diggins had a prior criminal history. Finally, trial counsel noted that Ms. DeMoss did, in fact, testify at trial.

According to trial counsel, he "banked" his defense strategy on a nonconclusive rape kit and believed that the State's case had "holes" in it. He stated that he did investigate the victim's sexual history and thought it aided the petitioner's case that the jury saw that the victim was pregnant with another man's child at trial. He also testified that he believed he had effectively cross-examined all the witnesses who testified.

After hearing the evidence presented at the post-conviction hearing, the court entered an order denying relief. The petitioner timely appeals that denial.

**Analysis**

On appeal, the petitioner contends that the trial court erred in denying his petition for post-conviction relief because he was denied his Sixth Amendment right to the effective assistance of

counsel. To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id.* at 461. "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, *conclusions of law*, are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id.*

On appeal, the petitioner specifically contends that trial counsel was ineffective by failing to: (1) adequately investigate; (2) adequately communicate with the petitioner, provide and discuss discovery, prepare the petitioner to testify, or convey plea offers; (3) elicit facts helpful to the defense at trial, namely the petitioner's lack of teeth; and (4) interview and call witnesses for the defense. In denying relief, the post-conviction court found as follows:

> . . . It's clear from the proof today, in the Court's opinion, that the Petitioner has failed to carry the burden of proof by clear and convincing evidence in that regard. There were strategy decisions to be made for purposes of this trial. Those decisions were made through the client and counsel as to which individuals should be called as witnesses. In hearing the testimony of Mr. Diggins today, very limited to what he could testify to if he had been called, basically he saw this - - at this point it would have been the alleged victim sometime after outside but at some distance of probably 15 feet from a very limited observation really could [not] add anything. But [trial

-7-

counsel] had strategy decisions to make, and I do [not] find that in any way has he dropped below the standard required of counsel in representation.

He testified he met with his client as many as four times in preparation for trial. He was already familiar with [the petitioner] because he [had] represented him on recent prior occasions.

It was a credibility issue for the jury, and the jury heard the testimony of the eight various witnesses and made a determination. The jury found [the petitioner] guilty of a lesser included offense in making their finding of fact.

Review of the record reveals nothing which preponderates against the trial court's findings. Based upon its findings, the post-conviction court resolved the issues of credibility presented in favor of trial counsel. It is not the province of this court to reweigh or reevaluate such determinations on appeal, as issues of credibility of witnesses and the weight to be given the testimony are to be resolved by the trier of fact. *See Henley*, 960 S.W.2d at 579. In contradiction to the petitioner, trial counsel testified that he met with the petitioner on multiple occasions, discussed the facts of the case and possible defenses, and provided and reviewed discovery with the petitioner. Moreover, trial counsel testified that he had discussions with the State regarding plea offers and conveyed those offers to the petitioner, but the petitioner refused to consider any offers as he insisted that he was innocent. He specifically stated that he investigated the victim's prior sexual history and decided to pursue a defense based upon the nonconclusive rape kit. Thus, trial counsel's testimony refuted each of the petitioner's claims, and, as the post-conviction court accredited his testimony, the petitioner has failed to carry his burden with regard to these issues.

No proof was presented with regard to the petitioner's assertion that trial counsel failed to present facts helpful to the defense, namely that the petitioner had no teeth, other than the petitioner's own testimony that it was not put forth. Trial counsel was not questioned regarding this issue at the post-conviction hearing, and no transcript of the evidence was introduced. Thus, the petitioner has failed to carry his burden of establishing deficient performance, especially in light of the fact that the emergency room doctor testified at trial that he did not notice any teeth marks in the victim's vaginal area.

Finally, nothing preponderates against the post-conviction court's finding that trial counsel's decision to not call Mr. Diggins as a witness was a matter of trial strategy. Trial counsel testified that he interviewed Mr. Diggins on the morning of trial and discussed what the substance of his testimony would be if he was called. Based upon the fact that Mr. Diggins was not present in the home at the time the assault was alleged to have occurred, trial counsel did not see that calling him was a good strategic decision. According to trial counsel, and supported by Mr. Diggins own testimony at the post-conviction hearing, all Mr. Diggins could testify to would be that shortly after the incident occurred, the victim, seen from a distance, appeared calm. The testimony would have been contradicted by Ms. DeMoss, who testified at trial that the victim was upset and crying when she arrived. Additionally, both the emergency doctor and nurse testified that the victim was so

distraught that she had to be sedated in order to be examined.  In light of these contradictions, especially in light of Mr. Diggins' prior criminal history, we, as did the post-conviction court, must conclude that trial counsel exercised his discretion in making a valid strategic decision.  As previously noted, the petitioner is not entitled to criticize a sound tactical decision made after adequate preparation. *See Cooper*, 847 S.W.2d at 528.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.


_____
JOHN EVERETT WILLIAMS, JUDGE